**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Patagonia Area Resource Alliance, et al.,<br>Plaintiffs,<br>v.<br>United States Forest Service, et al.,<br>Defendants. | No. CV-26-00496-TUC-RCC<br>**ORDER** |

Pending before the Court is Plaintiffs Patagonia Area Resource Alliance and Center for Biological Diversity's Motion for Preliminary Injunction, which seeks to halt implementation of the South32 Hermosa Critical Minerals Project while the Court considers Plaintiffs' challenges to the federal government's approval of the Project. (Doc. 15.) Federal Defendants U.S. Forest Service and Fish and Wildlife Service ("FWS") and Defendant-Intervenors South32 Hermosa Inc. ("South32") and UNS Electric, Inc. ("UNSE") oppose the Motion, and South32 moves to strike the declarations attached to the Motion. (Docs. 20, 25–27.) For the following reasons, the Court will deny both Plaintiffs' and South32's Motions.

## I. Background

### *a. The Hermosa Project*

South32 is developing the Hermosa Critical Minerals Project in the Harshaw Mining District near Patagonia, in Santa Cruz County, Arizona. (South32's Resp. to Mot. for

Prelim. Inj., Doc. 27 at 10; Record of Decision ("ROD"), Doc. 15-1 at 16.)[1] The Project targets domestic production of zinc, silver, lead, and manganese and would expand existing private-land mining and development activities onto approximately 423 acres of National Forest land. (Doc. 27 at 10; Doc. 15-1 at 6, 15.) South32 projects that the Project will double property tax revenue and create approximately "2,400 direct, indirect, and induced jobs in Santa Cruz County," and $290 million in labor income. (Risner Decl., Doc. 27-2 ¶¶ 40–42.)

The Project requires a new Primary Access Road, additional exploration and geotechnical drilling, a second tailings storage facility ("TSF2"), water infrastructure, connecting haul roads, and a transmission line proposed by UNSE. (Doc. 15-1 at 20–25; USFWS' Biological Opinion, Doc. 15-2 at 25–26.) Defendants claim the approximately 52,438-acre action area discussed in the briefing is the environmental-analysis area, but the acreage authorized for surface disturbance is "roughly 423 acres." (Fed. Def. Resp. to Mot. for Prelim. Inj., Doc. 25 at 10; UNSE Resp. to Mot. for Prelim. Inj., Doc. 26 at 2.) The distinction matters, but acreage alone does not resolve the Motion. A comparatively small disturbance may substantially affect critical habitat or limit a species movement corridor. Plaintiffs emphasize that the Patagonia Mountains provide important habitat and connectivity for several species, including jaguars, ocelots, Mexican spotted owls, western yellow-billed cuckoos, northern Mexican gartersnakes, and two plants—the beardless chinchweed and the Bartram's stonecrop. (Doc. 25 at 13.) FWS recognized that importance and anticipated adverse effects from the Project, while concluding that the Project would not jeopardize listed species or destroy or adversely modify designated critical habitat. (Doc. 15 at 2–4; Doc. 15-2 at 2–3, 12–13, 105–400.)

*b. Environmental Review and Consultation*

The Forest Service began consultation with FWS in December 2023, more than two years before FWS issued the final Biological Opinion ("BiOp"). (Doc. 15-2 at 13.) Formal consultation began in July 2025, following submission of the Forest Service's final

[1] Citations refer to the documents and page numbers generated by the Court's Case Management/Electronic Case Filing System.

Biological Assessment. (*Id.* at 16.) FWS issued its BiOp on February 26, 2026, approximately seven months after formal consultation began. (Doc. 15-2.) According to Federal Defendants, the proposed action was modified to incorporate approximately twenty-two additional conservation measures. (Doc. 25 at 4.)

This sequence reflects sustained interagency coordination and substantive revisions addressing potential environmental effects, undermining Plaintiffs' suggestion that the Project "was rushed though environmental review" (Doc. 15 at 2–3, 35) and therefore the BiOp inadequately addressed habitat, connectivity, and adverse modification concerns. However, the relevant question remains—whether the agencies considered the pertinent issues and whether their reasoning was arbitrary and capricious. *Northwest Motorcycle Assn. v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1471 (9th Cir. 1994) (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

*c. Activities Expected During Merits Review*

The Project's final scope differs materially from the work South32 represents it will undertake over the next twelve months. For the next year, South32 identifies geotechnical investigations, limited exploration drilling, work on previously disturbed areas, and safety fencing. (Doc. 27 at 12.) Its proposed investigation along the future Primary Access Road involves approximately forty-five locations and less than one acre of new disturbance. (*Id.* at 12–13.) Many locations are adjacent to existing roads; several would be accessed by helicopter without clearing conventional drill pads. (*Id.* at 12–14; Thompson Decl., Doc. 27-1 ¶¶ 33–46.)

Addressing the TSF2 footprint, South32 reports that a substantial portion of the investigation roadway and three drilling pads have already been constructed, encompassing approximately seven acres. (Doc. 27 at 15; Doc. 27-1 ¶ 35.) South32 identifies approximately 7.6 additional acres of disturbance for remaining investigation roads, pads, and exploration work. (Doc. 27 at 15.) South32 represents that construction of the TSF2 will not begin until 2028 and requires additional engineering and state permitting. (*Id.* at 16.) It also reports that the surface disturbance for the connecting haul-road work between

existing roads has already occurred and that no additional disturbance for that work is planned during the next twelve months. (*Id.* at 17–18; Doc. 27-1 ¶¶ 11–12, 14.)

UNSE's transmission-line work must be considered separately. Unlike the TSF2, the transmission line could be completed during the anticipated merits-review period. (Doc. 26 at 2; Doc. 26-1 at 11, ¶ 32.) UNSE began construction September 8, 2026, and reports that completion of the transmission line would create approximately 24.7 acres of disturbance on National Forest land, including approximately 16 acres of permanent vegetation removal. (Doc. 26 at 2; Doc. 15-5 at 52.)

## II. JURISDICTION AND GENERAL STANDARDS OF REVIEW

### *a. Existing Claims and Prospective Claims*

The parties' jurisdictional dispute requires a distinction between two kinds of claims. Plaintiffs presently challenge FWS's BiOp under the Administrative Procedure Act ("APA"). (Doc. 15 at 7; Doc. 1 ¶¶ 169–251.) They anticipate asserting an Endangered Species Act ("ESA") citizen-suit claim against the Forest Service after expiration of the statutory notice period. (Doc. 29 at 34, n.18.) Federal Defendants contend that the latter claim is not presently available and that the Court therefore lacks jurisdiction to provide injunctive relief on such claim. (Doc. 25 at 17.)

The Court will not adjudicate an unfiled citizen-suit claim or excuse compliance with 16 U.S.C. § 1540(g)(2)(A)(i). But the absence of that claim does not eliminate the Court's authority to consider the existing challenges to final agency action and review the preliminary injunction. A BiOp and accompanying incidental take statement may constitute final agency action subject to judicial review under the APA. *Bennett v. Spear*, 520 U.S. 154, 177–79 (1997). Therefore, the pending challenges to the completed BiOp and Forest Service approval are not rendered premature merely because a separate ESA citizen-suit claim against the Forest Service is not yet available.

Whether success on a particular APA claim would justify Project-wide relief Plaintiffs request is a separate question. "A preliminary injunction is appropriate when it grants relief of the same nature as that to be finally granted." *P. Radiation Oncology, LLC*

*v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015). For purposes of this Motion, the Court assumes that Plaintiffs' existing claims could support appropriately tailored relief against implementation of the challenged approvals. It does not assume subject-matter jurisdiction over an otherwise jurisdictionally barred ESA claim.

*b. Preliminary Injunction*

A preliminary injunction requires a showing that (1) the movant is "likely to succeed on the merits," (2) the movant is likely to suffer irreparable harm without preliminary relief, (3) the balance of equities favors relief, and (4) an injunction serves the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). A mere possibility of injury is insufficient. *Id.* at 22.

Under the Ninth Circuit's interpretation of *Winter*, serious questions going to the merits may support a preliminary injunction when the balance of hardships tips sharply toward the plaintiff and the remaining requirements are met. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132, 1135 (9th Cir. 2011). Defendants, however, contend that *Starbucks Corp. v. McKinney*, 602 U.S. 339 (2024) mandates a strict four-factor *Winter* analysis. (Doc. 27 at 11.) The Court need not resolve that contention. Plaintiffs have not established entitlement to relief under either formulation because they have not made the necessary showing of likely irreparable injury during the applicable period and the equitable considerations discussed below do not tip sharply in their favor.

*c. APA Review*

The APA directs courts to set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). To assess the likelihood of success on the merits of an APA claim, the Court examines whether the agency considered the relevant issues and explained the connection between the record and its decision. *Motor Vehicle Mfrs.*, 463 U.S. at 43. Scientific judgments within an agency's expertise receive appropriate deference; statutory interpretation remains the Court's responsibility. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024).

///

## III. DISCUSSION

### *a. Likelihood of Success on the Merits*

#### i. Critical Habitat

Plaintiffs contend that FWS's critical-habitat determinations are defective because they depend on regulatory language vacated after issuance of the BiOp. Specifically, the determinations applied a definition of "destruction or adverse modification" that allows environmental alteration so long as the alteration does not "appreciably diminish[] the value of critical habitat *as a whole*." 50 C.F.R. § 402.02 (2019) (emphasis added). Earlier this year, a California district court vacated that regulation and reinstated its predecessor, which does not include the "as a whole" language. *Ctr. for Bio. Diversity v. U.S. Dep't of Interior*, 837 F. Supp. 3d 1080, 1108, 1118 (N.D. Cal. 2026). Plaintiffs acknowledge that courts ordinarily evaluate a biological opinion under the regulations in effect when it was issued. (*Id.* at 7–8, n.9.) They contend, however, that this principle does not apply when a regulation is subsequently vacated as inconsistent with the ESA. (*Id.*) In their view, the challenged definition was void from its inception, and its presence in the regulations when FWS issued the BiOp does not establish the legality of the resulting decision. (*Id.*) Plaintiffs emphasize that Defendants obtained neither a stay nor prospective-only application of the vacatur. (*Id.*; Doc. 29 at 2 & n.2.)

Defendants respond that the California court did not expressly state that its decision applied retroactively and, moreover, that its decision is not binding. (Doc. 27 at 25–26) Regardless, Defendants contend that the BiOp's analysis remains sufficient under either version of the regulation because it separately addresses local habitat functions and effects. (*Id.* at 26–29.)

The Court finds this case is not precedential and notes it is also currently on appeal and not final. However, the Court does not treat an appeal as restoring the vacated regulatory language, nor does it decide the effect of vacatur solely by observing that the BiOp preceded the vacatur order. The preliminary question is whether Plaintiffs have demonstrated that reliance on the challenged language affected the result. *Gifford Pinchot*

*Task Force v. U.S. Fish & Wildlife Serv.*, 378 F.3d 1059, 1071–72 (9th Cir. 2004).

They have not. The BiOp confirms Defendants' position that FWS did more than compare the effect of disturbed acreage to the listed species "as a whole." For jaguars, FWS addressed the Project's effects on habitat features and connectivity within the local critical-habitat unit. (Doc. 15-2 at 247–51.) The BiOp acknowledged substantial restrictions to the jaguar but concluded that affected features would retain conservation functions and that connectivity would not be eliminated. (*Id.* at 73, 247–51.) For the Mexican spotted owl, the BiOp addressed the function of habitat within the action area. (*Id.* at 282–91.) For the cuckoo and the northern Mexican gartersnake, the BiOp considered effects within particular units or subunits. (*Id.* at 335–37, 341, 388.)

Those distinctions do not establish that any small percentage of habitat disturbance is necessarily lawful, but they are material under *Butte Environmental Council v. U.S. Army Corps of Engineers*, 620 F.3d 936, 948 (9th Cir. 2010), and *Rock Creek Alliance v. U.S. Fish & Wildlife Service*, 663 F.3d 439, 442–44 (9th Cir. 2011). Those cases permit consideration of scale, while requiring attention to whether a broad analysis obscures localized risks.

Plaintiffs' concern about degradation of an important corridor warrants full consideration on the merits. But the preliminary record does not establish that FWS ignored that issue or rested its determination solely on the relative size of the affected acreage. Therefore, the Court is not persuaded that Plaintiffs have demonstrated likely success as to this claim. But even if the Court found the regulatory issue presents serious questions to the merits, the remaining preliminary-injunction requirements remain unsatisfied.

ii. <u>Jaguar and Ocelot Harassment</u>

Plaintiffs also challenge the incidental take statement ("ITS") for jaguars and ocelots. (Doc. 15 at 11–13.) They argue that FWS anticipated harassment, but established a re-initiation of consultation trigger tied only to injury or death, leaving anticipated nonlethal take without any meaningful limit. (*Id.* at 12.) An ITS must specify the amount or extent of incidental take and provide an perceptible basis for determining when

authorized take has been exceeded. *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife Serv.*, 273 F.3d 1229, 1250–51 (9th Cir. 2001).

FWS explained why a precise numerical estimate would be difficult: Jaguars and ocelots are secretive, occupy large ranges, and may respond to disturbance in ways that are difficult to observe. (Doc. 15-2 at 261.) Given these limitations, FWS anticipated exposure of only a small number of individuals and limited authorized harassment to effects attributable to the Project as described and analyzed. (*Id.* at 262.) The ITS also requires monitoring, reporting, and implementation of measures addressing spotted cats and road crossings. (*Id.* at 269–70.)

These provisions support a preliminary conclusion that FWS evaluated harassment and described unacceptable take requiring re-initiation rather than disregarded it. The Project's described footprint, schedule, lighting, noise, and conservation measures provide substantive limits on the action analyzed. Monitoring is intended to identify departures and effects not previously considered. Injury or death supplies an additional trigger because FWS did not authorize those outcomes.

Plaintiffs nevertheless identify a substantial limitation in Defendants' reasoning: re-initiation based on new information or project modification is not necessarily a substitute for a trigger connected to exceeding take. Plaintiffs rely on *Oregon Natural Resources Council v. Allen*, 476 F.3d 1031, 1038 (9th Cir. 2007), and the recent jaguar decision in *Center for Biological Diversity v. United States Forest Service*, No. CV-24-00405-RM, 2026 WL 2935762, at *10–12 (D. Ariz. Sept. 30, 2026). (Doc. 29 at 10–13.) Their argument cannot be answered merely by counting monitoring provisions or noting the absence of recent jaguar detections.

However, on the present record, the Court finds that Plaintiffs have not established that FWS's characterization of the ITS as an unrestricted authorization of harassment is likely to prevail. For present purposes, FWS has satisfactorily explained the difficulty of quantification, described the anticipated effects, and imposed monitoring and action-specific limitations. But the Court does not finally decide whether those limitations satisfy

the distinct requirement to specify an enforceable extent of take. Even assuming this issue presents serious questions, Plaintiffs have not demonstrated likely irreparable injury from the work expected before merits adjudication. A potential defect in the ITS does not dispense with that showing or automatically establish the necessity of a project-wide injunction. *See Monsanto*, 561 U.S. at 165–66 (determining that if a less drastic remedy can address an injury, a preliminary injunction is unwarranted).

iii. <u>Mining Law, Organic Act, and FLPMA</u>

The parties dispute whether the Primary Access Road and water pipelines qualify as mining operations authorized under the Mining Law of 1872 and regulated under Part 228A, or instead require discretionary right-of-way authorization under FLPMA and Part 251. (Doc. 15 at 14–19; Doc. 25 at 28–29.) Plaintiffs argue that the Forest Service improperly treated the Primary Access Road and water pipelines as activities authorized by the Mining Law of 1872 rather than following the requirements for rights-of-way under FLPMA. (Doc. 15 at 15–18.) They emphasize that an existing route already provides access and contend that a secondary road is not authorized under the Mining Law. (Doc. 29 at 9–14.) Instead, they assert that those activities were subject to FLPMA's Title V right-of-way requirements, which require that the authorized use "do no unnecessary damage to the environment." (Doc. 15 at 15.)

Under Part 228A, the Forest Service's regulations expressly address roads and road use reasonably incident to mining operations, "regardless of whether said operations take place on or off mining claims." 36 C.F.R. § 228.3(a). They also address access-route location and environmental conditions. *Id.* § 228.12. Part 251 excludes uses properly authorized under the mineral regulations, including Section 228A. *Id.* § 251.50(a). These provisions support the Forest Service's position, provided the uses actually fall within its statutory authority; regulatory text alone cannot create a property entitlement the governing statutes do not confer.

The existence of an existing access route does not, standing alone, establish that a separate Primary Access Road falls outside the agency's authority or presumptively mean

development would "do unnecessary damage to the environment." The Forest Service compared the routes and identified tradeoffs involving public traffic, air quality, cultural resources, wildlife, and road improvements. (USFS Alternatives Evaluation Rpt., Doc. 15-9.) Its selection was not based only on South32's preference for another road. (*Id.*) The Forest Service considered that the selected route would move primary mine traffic away from Patagonia, while use of the existing route at the proposed operational scale would require substantial improvements. (Doc. 15-9 at 26.)

Nor does *Center for Biological Diversity v. United States Fish & Wildlife Service* ("*Rosemont*"), 33 F.4th 1202 (9th Cir. 2022), resolve Plaintiffs' infrastructure question presented here, as Plaintiffs suggest. *Rosemont* addressed asserted rights to occupy land for waste disposal and reserved questions concerning the application of Part 228A on remand. *Id.* at 1223–24. The present road and pipeline uses at issue here require their own statutory analysis. Plaintiffs have not shown at this stage that *Rosemont* categorically prohibits their approval as reasonably incident to lawful mining operations.

The Organic Act directs the Forest Service to regulate national-forest occupancy and use and preserve the forests from destruction, 16 U.S.C. § 551, while its implementing mining regulations require operators to "take all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations," 36 C.F.R. § 228.8(e). Plaintiffs argue that the Forest Service violated the Organic Act by improperly limiting its discretion to regulate the Private Access Road and water pipelines under Part 228A and by failing to require all practicable measures to protect wildlife habitat affected by the Project. (Doc. 29 at 18–19.)

The Organic Act claim must account for the mitigation the Forest Service actually required. The Forest Service's Record of Decision incorporated design features, conservation measures, monitoring, and ITS conditions into the approval. Examples include plant surveys, construction timing restrictions, lighting controls, biological monitoring, reclamation, and measures addressing invasive species. (Doc. 15-1 at 99–103.) The applicable regulations require feasible minimization and practicable wildlife

protections, not the elimination of every adverse effect. 36 C.F.R. § 228.8; *Rock Creek All. v. U.S. Forest Serv.*, 703 F. Supp. 2d 1152, 1170–72 (D. Mont. 2010).

Plaintiffs have not demonstrated that the agency failed to exercise its protective authority merely because the agency's action has some impact. The record reflects consideration of alternatives and enforceable mitigation, rather than a refusal to consider environmental protection. Therefore, the Court finds no demonstrated likelihood of success on the Organic Act or FLPMA theories sufficient to support the requested preliminary relief. The Court notes, however, this is a preliminary assessment, not a holding that mining-related infrastructure is exempt from applicable land-use requirements.

iv. Baseline Conditions

Plaintiffs contend that the Forest Service reached its conclusions without adequate information about the baseline groundwater conditions for the areas affected by drilling and discharge. (Doc. 15 at 22–25.) Defendants disagree, identifying groundwater sampling, regional modeling, spring-and-seep investigations, and studies addressing groundwater-dependent ecosystems. (Doc. 25 at 29–30; Doc. 27 at 41–44.)

An adequate environmental analysis requires a meaningful basis for assessing change, but direct measurement at every location is not always required. An agency may use representative data, modeling, or another reasonable method if it explains the method's relevance and limitations. *Great Basin Res. Watch v. Bureau of Land Mgmt.*, 844 F.3d 1095, 1101 (9th Cir. 2016); *Or. Nat. Desert Ass'n v. Jewell*, 840 F.3d 562, 568–70 (9th Cir. 2016).

Here, South32 identifies a baseline report using twenty-six monitoring wells, including wells away from the mine site and along relevant downstream waterways. (Doc. 27 at 41.) The Forest Service also used a regional groundwater model and considered spring-and-seep data bearing on groundwater connections. (Spring and Seep Baseline Characterization Rpt., Doc. 15 at 23, n.12.)

Proximity is relevant, but the more important consideration is whether the selected locations and model reasonably represent the hydrologic conditions and pathways being

evaluated. The present materials do not establish that the agencies omitted baseline analysis altogether. Plaintiffs dispute its representativeness and adequacy, but they have not shown a likelihood that reliance on nearby and regionally distributed data was unreasonable. Future monitoring cannot substitute for a missing pre-approval analysis; here, however, Defendants identify an existing baseline analysis supplemented by ongoing monitoring. The Court therefore finds no demonstrated likelihood of success on the baseline claim.

*b. Likelihood of Irreparable Harm*

i. The Relevant Period and Remaining Work

The Court must determine whether injury is likely before it can adjudicate the merits, not whether the completed Project could cause adverse effects over its operating life. *Winter*, 555 U.S. at 22; *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172–74 (9th Cir. 2011). A permanent effect that will occur during the relevant period in which the Court can determine the case on the merits is relevant to the irreparable harm determination, even if its consequences persist beyond merits review. Conversely, an effect associated only with a later construction phase does not establish present urgency without evidence that the phase is likely to occur before a merits decision.

Though not a guaranteed period for final adjudication, the next twelve months provide a useful planning horizon because South32 describes its proposed work in those terms. The Court's analysis depends on the represented construction sequence and limited scope during this one-year period, not on an assumption that the entire Project will be completed during that period.

Much of Plaintiffs' argument concerns the completed Primary Access Road, operation of the TSF2, long-term traffic, and effects of the full mining expansion. Those effects warrant merits review, but the represented near-term work is narrower. Some disturbance has already occurred, particularly within investigation-road and haul-road footprints. An injunction cannot prevent a completed disturbance, although it may prevent further injury at the same location. Thus, the Court considers the remaining work.

///

ii. Jaguars and Ocelots

Plaintiffs' corridor concerns are understandable, but their prediction of injury during the pertinent period is uncertain. The BiOp reports no jaguar detection in the action area or Patagonia Mountains since 1965 and anticipates exposure to very few jaguars or ocelots over the Project's life. (Doc. 15-2 at 261.) Those findings do not establish the species' absence from the Project Area, and they do not eliminate the conservation value of unoccupied movement habitat. They nevertheless bear on the likelihood of the species' exposure to construction disturbance during the next year.

The agencies also evaluated connectivity rather than assuming it irrelevant. FWS anticipated restrictions but concluded that passage would remain possible within the local unit. (Doc. 26 at 9.) Some measures to reduce the impact on the jaguars and ocelots include daylight construction for UNSE, lighting and noise controls, limited disturbance footprints, and biological monitoring. (*Id.* at 7–9; Doc. 27 at 30.)

Considering the limited work, its timing, the anticipated low exposure, and the retained corridor functions, Plaintiffs have not established likely irreparable injury during merits review. This conclusion does not hold that injury to an individual animal can never matter; it merely addresses the probability and consequences of the particular injury asserted on this record. *See Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (finding that a preliminary injunction does not require imminent threat of extinction, but does require "a definitive threat of future harm to protected species, not mere speculation" (citation omitted)).

iii. Mexican Spotted Owl and Yellow-Billed Cuckoo

For the Mexican spotted owl, the Court considers permanent habitat alteration separately from temporary noise. UNSE reports no nesting sites within the transmission corridor in its 2026 protocol surveys, proposes daytime construction, and identifies collision-reduction measures. It also represents that timely completion of work would avoid or reduce construction overlap with the breeding season. (Doc. 26 at 9–10.) These measures reduce risk; they do not make all disturbance harmless.

Plaintiffs' broader habitat-loss estimates include Project components not scheduled for construction during the one-year period. The record must connect the remaining work to likely injury during the relevant period. The identified survey results, limited construction footprint, seasonal restrictions, and mitigation weigh against the required showing for the remaining transmission and investigation work. (Doc. 27 at 14–17, 20; Doc. 26 at 9–10.)

For the cuckoo, UNSE states that the transmission-line disturbance lies outside designated critical habitat, that surveys detected no cuckoos in the disturbance areas, and that the proposed schedule would allow completion before the next nesting season. UNSE's measures also address newly discovered nests. (Doc. 26 at 11–12.) These facts diminish the likelihood of the asserted near-term injury from UNSE's work.

iv. Plants and Northern Mexican Gartersnake

The record identifies protective measures for Bartram's stonecrop and beardless chinchweed, including surveys, avoidance, dust controls, monitoring, and protective fencing. UNSE reports that neither plant was found in its surface-disturbance footprint. South32 also identifies its redesign of the tailings facility to avoid known chinchweed plants during initial construction. (Doc. 26 at 12–13; Doc. 27 at 15–16, 33–34.)

Plaintiffs have not demonstrated likely near-term injury. For the northern Mexican gartersnake, the transmission-line briefing identifies no aquatic or riparian habitat in or near the line's construction footprint and distinguishes water-discharge effects from UNSE's construction. (Doc. 26 at 12–14.) Those broader discharge concerns do not, without a temporal and causal connection, establish a basis to halt the transmission line.

Apart from the transmission line, Plaintiffs have not demonstrated that the limited activities expected during the next twelve months are likely to cause irreparable injury to Bartram's stonecrop, beardless chinchweed, or the northern Mexican gartersnake. South32 identifies the work anticipated in the next year to include geotechnical investigations, limited exploration drilling, work on previously disturbed land, and boundary fencing, rather than full construction and operation of the Project. (Doc. 27 at 12–18.) The

anticipated work may have some effect on the species. For example, for Bartram's stonecrop, Plaintiffs identify anticipated effects from construction and operation of the Primary Access Route in Flux Canyon, and the record acknowledges potential effects from helicopter-generated dust. (Doc. 15 at 31; Doc. 27 at 14.) Nevertheless, Plaintiffs have not sufficiently connected the broader construction effects they identify to likely irreparable injury from the more limited investigation work, taking into account the preconstruction surveys, monitoring, and other plant-protection measures described in the briefing. (Doc. 25 at 39; Doc. 27 at 13–14, 34.)

For beardless chinchweed, South32 explains that the TSF2 footprint was redesigned to avoid known plants, that preconstruction surveys and temporary protective fencing will address the risk of trampling, and that invasive-species measures will apply, but construction of TSF2 itself is not scheduled to begin until 2028. (Doc. 27 at 15–17.) Although the BiOp anticipates possible adverse effects to chinchweed over the Project's life, Plaintiffs have not shown that the remaining near-term investigation, drilling, roadwork, or fencing is likely to cause irreparable injury notwithstanding those protections. (*Id.* at 15–18; Doc. 25 at 39–40; .)

Finally, the identified concerns for the northern Mexican gartersnake involve treated-water discharges and effects on waterways, but Plaintiffs have not connected those concerns to a specific activity expected during the next year that is likely to injure the species or its habitat. (Doc. 26 at 14; Doc. 27 at 12.)

v. <u>Recreational Interests and Permanent Disturbance</u>

Plaintiffs' members identify recreational, aesthetic, and wildlife-observation interests. Plaintiffs also correctly emphasize that some vegetation and habitat losses may persist for many years. (Doc. 29 at 25, 30.) But an allegation of long-lived environmental change does not automatically establish entitlement to the requested injunction. *See Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 545 (1987). The Court must consider the specific places affected, remaining activities, timing, mitigation, and relationship to members' identified uses. Again, much of the asserted injury addresses the final, long-term

Project, while the evidence concerning the imminent investigation and utility work is much more limited and contested. The Court finds that Plaintiffs have not made the required clear showing of likely irreparable injury warranting the Project-wide relief requested.

*c. Balance of Equities and Public Interest*

Although the governmental equities and public interest overlap, the Court considers the separate effects on South32, UNSE, their workers, and affected third parties. *Winter*, 555 U.S. at 24.

The parties agree that FAST-41 applies to this covered Project. (Doc. 15 at 35; Doc. 26 at 14–15.) The statute requires the Court to consider "the potential effects on public health, safety, and the environment, and the potential for significant negative effects on jobs resulting from an order or injunction," and provides that the Court "shall . . . not presume" those harms reparable. 42 U.S.C. § 4370m-6(b).

The record identifies a substantial public interest in domestic critical-mineral supply. Federal Defendants and South32 describe manganese and zinc as important to national security and industrial supply chains and explain that a delay in enabling infrastructure can postpone expanded production even if extraction continues on private land. (Doc. 25 at 32–33; Doc. 27 at 23–24.) Congress has also identified critical minerals as important to national security. 30 U.S.C. § 1607(b)–(c). Here, the national security interests are relevant and substantial, though not independently dispositive.

The Court also considers employment and community effects. South32 projects approximately 2,380 direct, indirect, and induced jobs and $26 million in annual local tax revenue. More immediately, South32's briefing identifies contractor commitments, workforce-development investments, and declarations describing risks of layoffs and disrupted business operations from a prolonged pause. UNSE likewise identifies mobilized contractors and reserved personnel whose work would be interrupted. (Doc. 27 at 10, 21–22; Doc. 26 at 15.)

Plaintiffs respond that mining could continue on private land for years and that a temporary delay would not eliminate the minerals or all eventual benefits. (Doc. 29 at 35–

38; Doc. 27 at 22.) That response limits the weight of claims suggesting the injunction would destroy the entire Project's economic value, but it does not establish that current construction employment, vendor commitments, and integrated development schedules would be unaffected. The Court does not presume those harms reparable simply because some mining could continue.

There are competing environmental consequences as well. UNSE identifies the risk that delay would move work into sensitive breeding periods, postpone reclamation of disturbed areas, and prolong reliance on on-site generation and fuel deliveries. (Doc. 26 at 16–17.) These are prospective consequences, but they nevertheless weigh against treating a pause as environmentally costless.

On the record before the Court, the concrete consequences of interrupting the limited work to occur in the next year, considered alongside the uncertainty and mitigation of Plaintiffs' asserted injuries, weigh against the requested injunction and thus do not tip sharply toward Plaintiffs. Even if the Court were to consider the equitable weighing of factors for a preliminary injunction as Plaintiffs request, their failure to demonstrate likely irreparable harm independently defeats relief.

## IV. Scope of the Ruling

The Court's decision is preliminary. It does not adjudicate all claims, validate every aspect of the Project, or authorize departures from existing permit conditions.

For purposes of the irreparable-harm analysis, the Court has considered Plaintiffs' declarations, including their descriptions of members' use of the area and predicted injury. The Motion fails even with that consideration. The separate question whether portions of those declarations may supplement the administrative record for merits review need not be resolved to decide this Motion. Therefore, the Court will deny South32's Motion to Strike Declarations. (Doc. 20.)

## V. Conclusion

Plaintiffs have not established entitlement to preliminary injunctive relief under *Winter* or the Ninth Circuit's serious-questions formulation. In particular, their showing of

likely irreparable injury does not adequately distinguish the limited work expected during merits review from the effects of the completed Project.

Accordingly,

IT IS ORDERED:

1) Plaintiffs' Motion for Preliminary Injunction is DENIED. (Doc. 15.)
2) South32's Motion to Strike Declarations Submitted with Plaintiffs' Motion for Preliminary Injunction is DENIED. (Doc. 20.)
3) This ruling does not resolve Plaintiffs' claims on the merits.
4) Within fourteen days of the date of this Order, the parties shall submit a joint proposed expedited briefing schedule.

Dated this 6th day of November, 2026.



Honorable Raner C. Collins
Senior United States District Judge